Filed 8/23/22 Zwanziger v. Zwanziger Land and Cattle CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| KARL DAVID ZWANZIGER, | C092665 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. SCCVCV2018148) |
| v. | |
| ZWANZIGER LAND AND CATTLE CORP., | |
| Defendant, Cross-complainant and Appellant; | |
| G. MARTIN ZWANZIGER et al., | |
| Defendants and Respondents. | |

This appeal centers around a dispute involving two brothers, Karl David Zwanziger and G. Martin Zwanziger,[1] and the family cattle ranch business, Zwanziger Land and Cattle Corporation (Ranch). Following the death of their father Roger Zwanziger in 2016, Karl sued the Ranch, as well as Martin and Martin's wife Joyce Zwanziger, both individually and as trustees of the G. Martin Zwanziger and Joyce I. Zwanziger 1994 revocable living trust, asserting various causes of action concerning

---

[1] Given the numerous parties and people involved in this case with the last name Zwanziger, we will refer to them by their first names. No disrespect is intended.

1

ownership of stock in the Ranch and Martin's use of Ranch funds. The Ranch filed a cross-complaint against Karl, as an individual and as executor of Roger's will, seeking a declaration of ownership of certain shares of the Ranch and the land used by the Ranch.

The trial court sustained Karl's demurrer to the Ranch's alleged causes of action pertaining to the land used by the Ranch because those causes of action were brought beyond the applicable statute of limitations. Following a bench trial, the trial court found Karl was not a shareholder of the Ranch.

Karl filed an appeal and the Ranch filed a cross-appeal. We agree with Karl that the trial court was precluded from considering defendants' new theory advanced in their closing briefing, which contradicted their responses to Karl's requests for admissions. Based on the theory of recovery asserted in the admissions, and stipulated to at trial, Karl has shown as a matter of law that he is a valid shareholder of the Ranch. We disagree with the Ranch that the trial court erred by sustaining the demurrer. We accordingly affirm the order sustaining the demurrer but reverse the judgment after trial and order the trial court to impose judgment finding Karl is a shareholder of 100 shares of Ranch stock. We remand the matter for the trial court to consider Karl's remaining claims.

FACTUAL AND PROCEDURAL HISTORY

In 1982, Roger incorporated the Ranch and issued 1000 shares to himself. Soon after, and over the course of five years, Roger transferred a total of 100 shares to each of his sons Martin and Karl. During those five years, Karl worked as an employee of the Ranch, was an officer of the Ranch, and was on the Ranch's board of directors. In 1988, Karl decided to move to the state of Washington with his wife. Thereafter, Roger asked Karl to resign as vice president of the Ranch. Karl took offense to the request and sent a letter addressed to Roger, Roger's wife and Karl's mother Patsy Zwanziger, and Martin. The letter provided: " 'Dear Roger, Pat, and Martin, here are the documents that you requested I sign. I've given much thought and consideration to their meaning and have no regrets in signing them. I do, however, feel disturbed that you distrust me to the point

of thinking that I would try to tamper with the [Ranch's] accounts. I do not know that I have ever done anything to lead you to have these thoughts.

'Please use the enclosed document from me to transfer my stock . . . in the corporation to Martin. I've been . . . considering doing this for quite a while. I want all anticipation of what I might do with the stock taken away. I want the [R]anch to be all in one piece and believe it would be best for Martin to own my shares. [¶] This also relieves the tension about life insurance. I am, therefore, offering my life insurance policy . . . to Martin to take over. He can pay me the sum of the surrender value.

'I am also offering all of my livestock to Martin to buy if he wishes. If not, please sell them through the auction yard. I don't feel it is fair for you to tend to them in my absence. I've had to honestly face the situation and have come to the conclusion that I will not be able to work the [R]anch with you in the future. I love each one of you and wish for your happiness and the success of the [R]anch. [¶] Sincerely, Karl.' "

With the letter, was a handwritten statement (transfer statement), signed and dated by Karl, providing: "I, Karl David Zwanziger, on this day, March 7, 1988, hereby on my own freewill, relinquish all stock in Zwanziger Land and Cattle Corporation and transfer ownership to G. Martin Zwanziger. He shall from this day forward receive all benefits and responsibilities associated with said stock."

After nearly a month of receiving no response, Karl wrote again to Roger, Patsy, and Martin inquiring of the progress of the stock transfer. Shortly after sending his letter, Karl received a letter from Roger, which was dated before Karl's letter was sent. In the letter, Roger told Karl they had sold his five steers and that he was sad regarding Karl's feelings about being asked to resign as vice president of the Ranch. Roger explained the resignation request was purely a business decision because Karl no longer lived nearby to help with the day-to-day operations of the Ranch. Roger believed that, as a member of the Ranch's board of directors, Karl would have the same power over the accounts as the rest of the family and Roger did not want that arrangement to change.

3

Thereafter, Karl and Roger spoke on the phone.[2]  During the conversation, Roger told Karl he did not want to take Karl's shares and if Karl wanted to give his shares to Martin, then Karl would have to talk with Martin.  According to Karl, he then spoke to Martin and Martin told Karl he did not want Karl's shares.  According to Martin, Karl never spoke to him about the shares and Martin did not know about Karl's letter to him and their parents, or the transfer statement, until December 2016.

Between 1988 and Roger's death in 2016, Karl was treated as a shareholder.  Karl received tax documents from the Ranch that he incorporated into his taxes every year.  He further received and signed government-related documents asserting his shareholder status.  In addition to remaining a shareholder, Karl also remained on the Ranch's board of directors until 2001.

Shortly before Roger died in 2016, Karl spent several weeks with Roger at Martin's home, which was located on land used by the Ranch.  Roger expressed concern to Karl about Martin's ability to run the Ranch.  This caused Karl to go into Martin's office and look through Ranch-related documents.  When doing so, Karl found several items that concerned him.[3]  Roger soon died.  In December 2016, when going through his father's paperwork, Martin found the letter and transfer statement from Karl purporting to transfer his shares in the Ranch to Martin.  The stock certificates representing those shares were located in the Ranch's corporate book until Karl took them in March 2017.

---

[2]  This conversation between Karl and Roger was admitted as state of mind evidence and not for its truth.

[3]  While Karl's discovery led to the instant lawsuit, the substance of the discovery is irrelevant to this appeal, and we need not relate further facts in this regard.

4

On February 8, 2018, Karl filed a verified complaint for damages and injunctive relief and a petition for writ of mandamus against Martin, his wife Joyce,[4] and the Ranch. Karl sought a declaration of his shareholder status and damages related to breaches of fiduciary duty and fraud perpetrated by Martin, Joyce, and the couple's children, who were all on the Ranch's board of directors. Karl also sought removal of the board of directors and access to the Ranch's records for inspection.

On April 19, 2018, the Ranch filed a cross-complaint against Karl, as an individual and executor of Roger's will. The Ranch alleged Roger and the Ranch entered an oral agreement to transfer title in the land used by the Ranch from Roger to the Ranch, however, the deed was never recorded. The Ranch sought to quiet title against Karl -- who asserted ownership of the land as the executor of Roger's will -- and all others who may claim an ownership right to the land.

On April 23, 2018, the Ranch, Martin, and Joyce answered special interrogatories propounded by Karl. In response to the request to state all facts and identify all witnesses and documents on which they based their denial of Karl's shareholder status, all three parties responded they "no longer question Karl Zwanziger's status as a shareholder of the [Ranch]." These responses were all given with the disclaimer that the responding parties had not completed their investigation of the facts or legal research into the theories to be presented at trial and that the answers were subject to change. On the same day, the Ranch, Martin, and Joyce, also responded to requests for admissions. In their responses, they all admitted that Karl was a shareholder of the Ranch and owned 100 shares. They also admitted that Karl's "stock certificates" were not canceled, surrendered, or redeemed. These admissions were accompanied by the same disclaimer accompanying the Ranch's, Martin's, and Joyce's responses to the special interrogatories.

---

[4] As described, Karl sued Martin and Joyce as individuals and trustees of the G. Martin Zwanziger and Joyce I. Zwanziger 1994 revocable living trust.

5

Defendants never amended or otherwise changed their responses to the special interrogatories or requests for admissions.

The next day, on April 24, 2018, Martin, Joyce, and their two children held a meeting of the Ranch's board of directors. At the meeting, the Ranch's board of directors passed a resolution "[t]hat the offer of shareholder, Karl Zwanziger, dated March 7, 1988, to surrender all of his outstanding shares in the [the Ranch] and transfer them to G. Martin Zwanziger is hereby accepted." The board of directors further resolved that the stock certificates held by Karl were void and replacement stock certificates would issue to Martin.

On April 26, 2018, the Ranch filed a first amended cross-complaint again seeking to quiet title to the land used by the Ranch based on the oral contract between Roger and the Ranch. The first amended cross-complaint also sought a declaration "as to whether the shares of KARL ZWANZIGER were, indeed, surrendered by him, whether that surrender was accepted by [the Ranch], and whether the share[s] were thereupon canceled by [the Ranch]." The Ranch prayed "for Judgment as follows: [¶] a. For a declaration of the rights and interests of the parties and, specifically, as to whether Cross-Defendant KARL ZWANZIGER is the owner of shares of [the Ranch.]"

At some point Karl filed a first amended complaint.[5] Defendants filed an answer to the first amended complaint "admit[ting] that, as of April 24, 2018, they admitted that Karl owned 100 shares in the [Ranch] constituting 10% of its outstanding stock, and that the Defendants had [*sic*] at that time, were informed and believed that Karl's shares had been surrendered, but the [Ranch]'s Board of Directors have since formally accepted Karl's offer to surrender his shares, and said Defendants are now informed and believe that he no longer owns them."

---

**5**    The first amended complaint was not made part of the record.

6

The Ranch filed several more amended cross-complaints, ending with the operative cross-complaint filed in December 2018. The operative cross-complaint elaborated on its allegations pertaining to the land used by the Ranch; however, the operative cross-complaint maintained the Ranch's right to the land was based on a 1982 oral agreement between Roger and the Ranch. The Ranch further alleged it and Roger believed the conveyance of title had been effected by the execution and delivery of all necessary documents, but, in 2018, the Ranch became aware no instrument of conveyance, recorded or unrecorded, could be located. As such, the Ranch alleged Roger "fully performed [his] respective obligations under the Agreement, except, apparently, for the delivery of a deed or other instrument formally conveying title . . . ." The Ranch alleged three claims for relief pertaining to the land it used. Specifically, the Ranch sought specific performance that Karl convey the land used by the Ranch to the Ranch, a judicial decree that Karl holds title to the land used by the Ranch in a constructive trust for the Ranch, and a declaration of the rights and interests of the parties as to the ownership of the land used by the Ranch. The facts and prayer for relief pertaining to the shares remained substantially the same.

Karl filed a demurrer to the causes of action in the operative cross-complaint pertaining to the land used by the Ranch. The trial court sustained the demurrer because the causes of action were barred by the applicable statute of limitations.

At a bench trial, Karl's attorney read into evidence Martin's, Joyce's, and the Ranch's answers to the special interrogatories and alerted the trial court to their responses to the requests for admissions indicating that, as of April 23, 2018, they agreed Karl was a shareholder of the Ranch. The attorney for Martin, Joyce, and the Ranch stated the question being litigated was who should have ownership of the shares, and that the evidence would show the gift made by Karl was still subject to acceptance by Martin, which Martin accepted the day after the interrogatories and requests for admissions were completed. Both counsel agreed that, up to the acceptance of the gift by Martin and the

7

Ranch on April 24, 2018, the shares were in Karl's name. The trial court summarized the parties agreement as follows: "So, counsel, there's an agreement then that up to the date of the responses and I believe that that was April 2018 -- April 23rd of 2018 that there had been no acceptance of Mr. Karl's . . . prior offer to gift. There was no acceptance that the stocks were still held and owned by Mr. Karl up until April 24th, 2018, at which time Mr. Martin is arguing that they accepted the gift . . . [¶] . . . that was made in 1988 and, from that point forward, the stocks were gifted." Counsel for defendants answered "[t]hat's correct."

In defendants' posttrial briefing, they argued Karl's letter and transfer statement were not offers conditioned on acceptance by Martin but were the unequivocal transfer of shares. Defendants argued the gift was presumptively accepted by Martin once Karl delivered the transfer statement to the third party transferee (Roger) to deliver to Martin. Defendants further argued it was not Roger's legal right to revoke the gift, nor could Karl revoke the gift once he delivered it to Roger to give to Martin. The power to revoke was held by Martin alone, but because Martin did not know of the gift, Karl continued to be considered a record shareholder of the Ranch until those records were corrected on April 24, 2018, when Martin and the board of directors of the Ranch effected the transfer. Thus, according to defendants, the gift was perfected in 1988 and Karl's later attempts to revoke the gift were ineffective.

The trial court agreed and found Karl unconditionally intended to gift his shares to Martin as evidenced by the 1988 letter and transfer statement mailed to Roger. The court further found Karl could not have physically delivered the shares (which are represented by the stock certificates) because the stock certificates were located in the corporate book and not with Karl, but that Karl symbolically delivered the shares by mailing the transfer statement to Roger that unequivocally transferred his shares to Martin. Finally, the trial court found that Karl's delivery of the transfer statement to Roger with the intent that Roger deliver the transfer statement to Martin, made it so that Martin presumptively

8

accepted the gift of shares. To the trial court, it was of no consequence that Roger and Martin continued to treat Karl as a shareholder because receiving shareholder benefits was separate and apart from ownership of the shares themselves.

Karl filed a request for a statement of decision and notice of intent to file a motion to vacate. In it, he requested the court respond to several questions, including the basis upon which the trial court rejected defendants' responses to the special interrogatories and requests for admissions and their stipulation the gift had not been perfected before April 24, 2018. In its response, the trial court stated it found defendants' responses to the special interrogatories and requests for admissions ambiguous. It was clear to the trial court that Karl understood the admissions and responses to mean defendants did not recognize a valid gift before April 24, 2018, but that defendants understood the answers and admissions to mean the stock certificates had not yet been transferred and Karl was merely the owner of record of the shares. As for the trial court's rejection of the stipulation, the trial court stated it was "not bound by the stipulation of the parties [because] it [was] contrary to the law and facts of the case."

Karl appeals the trial court's judgment after trial, and the Ranch appeals the trial court's order sustaining the demurrer to the causes of action in the operative cross-complaint pertaining to the land used by the Ranch.

## DISCUSSION

### I

*The Trial Court Erred By Considering*

*A Theory Contradicted By Defendants' Admissions*

Karl contends it was error for the trial court to consider evidence and argument contrary to defendants' responses to the requests for admissions that indicated Karl was a shareholder of 100 shares of the Ranch prior to April 24, 2018, and his stock certificates had not been transferred, canceled, or surrendered before that time. To Karl, these

9

admissions were unambiguous and constitute conclusive proof his shares were not gifted to Martin before April 24, 2018. We agree.

"A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48.) "Judicial admissions may be made in a pleading, by stipulation during trial, or by response to request for admission." (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746.)

" 'Although the request for admissions is placed in a discovery statute, it is *not a discovery device.*' " (*Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 276 (*Fredericks*).) The purpose of the request for admissions procedure is "to expedite trials and to eliminate the need for proof when matters are not legitimately contested." (*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 783.) Thus, any matter admitted in response to a request for admission is conclusively established against the party making the admission, unless the court has permitted withdrawal or amendment of the admission. (Code Civ. Proc., § 2033.410, subd. (a); *Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 736.)

A response that is subject to different meanings does not conclusively establish a fact. (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 260; *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 360; *Fredericks*, *supra*, 189 Cal.App.3d at pp. 277-278.) "Although admissions are dispositive in most cases, a trial court retains discretion to determine their scope and effect. An admission of a fact may be misleading. In those cases in which the court determines that an admission may be susceptible of different meanings, the court must use its discretion to determine the scope and effect of the admission so that it accurately reflects what facts are admitted in the light of other evidence." (*Fredericks*, at p. 277.) It is important, however, that a request for admission not become "a device to hide or confuse issues." (*Id.* at p. 278; see also *Burch v. Gombos*, *supra*, 82 Cal.App.4th at p. 360.) Whether an admission is misleading or

10

ambiguous is a question we review de novo. (See *Fischer v. First Internat. Bank* (2003) 109 Cal.App.4th 1433, 1443 ["A trial court's threshold determination as to whether there is an ambiguity permitting the admission of parol evidence is . . . a question of law subject to independent review"].)

Karl points to several cases to illustrate defendants' admissions were not ambiguous, and thus the court was precluded from permitting evidence to explain the admissions. (Citing *Milton v. Montgomery Ward & Co., Inc.* (1973) 33 Cal.App.3d 133; *Fredericks*, *supra*, 189 Cal.App.3d 272; *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264 (*Valerio*).) We relate the facts of those cases we find instructive, foregoing a recitation of *Milton* because the appellate court in that case concluded the defendant acquiesced to the trial court's interpretation of the admission and thus did not inquire into the ambiguity of the admission. (*Milton*, at p. 139.)

In *Fredericks*, an owner responded to a request for admission by admitting he had agreed to make payments to a contractor according to a payment schedule. (*Fredericks*, *supra*, 189 Cal.App.3d at p. 276.) The owner contended, however, that the intention of the parties was that payments would be made only if work progressed. The trial court received additional evidence pertaining to the parties' interpretation of the contract and entered judgment for the owner. (*Id.* at p. 277.) The contractor argued on appeal the trial court was bound by the owner's admission he had agreed to make payments pursuant to the contract, without regard for work completed. The appellate court upheld the trial court's finding of ambiguity stating: "The more narrow the language in the request for an admission, the less opportunity the court has to determine its scope and effect. If, for example, the request for admission propounded to [the owner] in the instant case said, 'Did you agree to make progressive payments to [the contractor] according to the schedule set forth in the March 6 documents irrespective of work performed by [the contractor]?' there would have been no issue as to the party's intentions concerning the

11

payment schedule. The court therefore would have had no reason to admit parol evidence on this issue." (*Ibid.*)

In *Valerio*, a subcontractor sued the general contractor, alleging in the alternative breach of express written contract and quantum meruit. (*Valerio*, *supra*, 103 Cal.App.4th at pp. 1266-1267.) The general contractor filed a cross-complaint, and in his answer to the cross-complaint the subcontractor admitted that a written contract between the parties existed. (*Id.* at pp. 1267-1268.) The subcontractor made a similar admission in his response to requests for admissions. (*Id.* at p. 1268.) At trial, however, the subcontractor took the position that no executed contract existed. (*Id.* at pp. 1268-1269.) The trial court concluded there was no contract because there was no mutuality of assent and entered judgment on a quantum meruit theory. (*Id.* at p. 1269.)

The general contractor appealed, and the appellate court reversed, holding the trial court "failed to give conclusive effect to [the subcontractor's] judicial admissions regarding the existence of a written contract." (*Valerio*, *supra*, 103 Cal.App.4th at p. 1267.) The court concluded as follows: "Unlike the circumstances of *Fredericks* . . . , there was no ambiguity in [the subcontractor's] understanding at the time he responded to the requests for admissions. [The subcontractor] clearly believed that a written contract existed. He admits that, at the time of the response, trial counsel labored under the 'misconception . . . that there was in place a fully executed written agreement between the parties.' Accordingly, there was no reason for the court to interpret the admission in order to resolve an ambiguity or reflect [the subcontractor's] reasonable understanding of the facts. Simply put, [the subcontractor] filed a mistaken response that he never later moved to amend or withdraw. Moreover, if [the subcontractor] disagreed that a written contract existed, he was required under Code of Civil Procedure section 2033, subdivision (f)(1)(B) to deny the portion of the requested admission that he considered untrue. [The subcontractor] was aware that he could qualify his admission, as reflected in his response to request for admission No. four. [¶] It is apparent from the court's

12

remarks that motions to amend or withdraw would have been granted. While the result here is rigorous, the rule is clear and [the contractor] is entitled to rely upon it." (*Valerio*, at pp. 1273-1274.)

This case is like *Valerio* in that the record is clear to defendants' understanding of their admissions at the time they were made, and they took an entirely different approach in their closing briefs than they had during discovery and at trial. On April 23, 2018, defendants admitted Karl was a shareholder of the Ranch and owned 100 shares. They also admitted he had not surrendered his stock certificates. On that same day, defendants further responded to special interrogatories. In those responses, defendants asserted they no longer disputed Karl's status as a shareholder of the Ranch prior to April 24, 2018. These responses explain defendants' understanding of their admissions -- that Karl was a valid shareholder who owned stocks.

Defendants' understanding of their admissions was further explained two days later in the Ranch's first amended cross-complaint, where it, for the first time, sought a determination as to whether Karl owned the shares -- impliedly conceding he had owned the shares before the filing of the amended cross-complaint. Shortly thereafter, defendants filed an answer to the first amended complaint. Therein, defendants also admitted Karl owned 100 shares of the Ranch before April 24, 2018, and asked the court for a declaration that Karl surrendered his shares. These admissions and request for a declaration demonstrate defendants believed Karl's surrender was not effective until April 24, 2018, and there was no question of ownership of the shares prior to that date.

The trial court found defendants' understanding of their admissions was that Karl was merely the owner of record of the shares as indicated on the stock certificates. Defendants' conduct at trial, however, does not support this conclusion. At the start of trial, defendants stipulated the shares were still held and owned by Karl until April 24, 2018, and the dispositive legal issue was whether the gift made by Karl was still subject to acceptance by Martin the day after defendants responded to the special interrogatories

13

and requests for admissions. While the trial court was permitted to reject the parties' legal stipulation if contrary to the facts and law (see *People v. Castillo* (2010) 49 Cal.4th 145, 171 [" '[w]hen a particular legal conclusion follows from a given state of facts, no stipulation of counsel can prevent the court from so declaring it' "]), the trial court was not permitted to reject defendants' responses to the requests for admissions that Karl was a shareholder of 100 shares and had not surrendered his stock certificates before April 24, 2018. "While the result here is rigorous, the rule is clear and [Karl] is entitled to rely upon it." (*Valerio*, *supra*, 103 Cal.App.4th at pp. 1273-1274.)

Defendants put much importance in the timing of their admissions. They claim they admitted the facts known to them at the time of the admissions (April 23, 2018), and those facts changed the next day when the Ranch's board of directors passed a resolution formally transferring the shares from Karl to Martin. To defendants, this provides an explanation for why their admissions could be reasonably interpreted as referring to the official ownership of the shares as represented by the stock certificates. If Karl wanted clearer responses, defendants assert, he should have asked different questions like, " 'Do you contend that you have a legal right to the 100 shares standing in KARL's name?' or, 'Did KARL make a gift of his shares to you?' " But Karl did ask questions such as these in the special interrogatories propounded to defendants. He asked for defendants to supply all evidence and documents upon which they based their belief Karl did not own the shares. Defendants responded they "no longer question Karl Zwanziger's status as a shareholder of the [Ranch]." If defendants believed they were gifted stocks in 1988 but simply did not know of it *until 2016*, the requests for admissions and special interrogatories propounded and responded to *in 2018* would reflect a dispute over whether Karl was a shareholder, either in law or equity, before April 24, 2018. Moreover, even if defendants had filed a mistaken response, they did not later move to amend or withdraw it as required. (*Valerio*, *supra*, 103 Cal.App.4th at pp. 1273-1274; see Code Civ. Proc., § 2033.410, subd. (a) [any matter admitted in response to a request

14

for admission is conclusively established against the party making the admission, unless the court has permitted withdrawal or amendment of the admission].)

Further, defendants responded to the request for admissions a day before they took deliberative action affecting the legal questions presented in the case. Now, defendants are relying on that action to inject ambiguity into their admissions in the hopes we interpret their admissions in a way that supports a legal theory that, at trial, defendants stipulated they were not pursuing. "[I]t is important that [a request for admission] not become 'a device to hide or confuse issues.' " (*Burch v. Gombos*, *supra*, 82 Cal.App.4th at p. 360.) To conclude defendants' admissions were ambiguous in light of their responses to the special interrogatories and stipulation at trial would hide and confuse the issues, making this a case where defendants pursued a single legal theory throughout litigation just to rely on a wholly different theory in closing briefing. Such conduct cannot be condoned.

Given the permissible use of the evidence presented at trial, Karl did not have the intent to gift Martin his shares as a matter of law when Martin accepted and received the shares on April 24, 2018. (See *Union Mutual Life Ins. Co. v. Broderick* (1925) 196 Cal. 497, 502-503 [unless the donor intends to divest itself completely of control and dominion over the property, the gift is incomplete].) At the time the gift was accepted by Martin, Karl had already filed a complaint in the instant lawsuit asserting his rights as a shareholder. This act unequivocally demonstrated Karl's intent to maintain his status as a shareholder instead of transferring that status to Martin. Accordingly, Martin could not accept Karl's 1988 offer on April 24, 2018, and Karl is the owner of the 100 shares.

II

*The Trial Court Did Not Err By Sustaining Karl's Demurrer To The Three Causes Of Action In The Cross-Complaint Pertaining To The Land Used By The Ranch*

The Ranch contends the trial court erred by sustaining Roger's demurrer to three causes of action alleged in the cross-complaint pertaining to the land used by the Ranch.

15

The Ranch argues the trial court's application of Code of Civil Procedure section 366.2 was improper and all of the Ranch's causes of action fell within the applicable statute of limitations. We disagree.

Code of Civil Procedure section 366.2 provides in pertinent part: "(a) If a person against whom an action may be brought on a liability of the person, whether arising in contract, tort, or otherwise, and whether accrued or not accrued, dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced within one year after the date of death, and the limitations period that would have been applicable does not apply."

Citing *Estate of Yool* (2007) 151 Cal.App.4th 867, the Ranch argues it was error for the trial court to apply this provision because Code of Civil Procedure section 366.2 is not applicable to cases involving title to real property. Not so. The Ranch's characterization of *Yool* is oversimplistic. *Yool* interpreted the phrase "liability of the person" and defined the phrase as " '[l]iability for which one is personally accountable and for which a wronged party can seek satisfaction out of the wrongdoer's personal assets.' " (*Id*. at p. 875, quoting Black's Law Dict. (8th ed. 2004) p. 933.)

In *Yool*, the daughter of the decedent mother claimed that certain real property was not part of the mother's estate. The property had been purchased by the daughter, but the mother was added to title to facilitate financing. The daughter claimed the property was hers under a theory of a resulting trust. (*Estate of Yool*, *supra*, 151 Cal.App.4th at p. 871.) The court held the one-year limitations period of Code of Civil Procedure section 366.2 did not apply to a claim on a resulting trust because the resulting trust was not a "liability of the person" as used in that section. The court explained that "liability of the person" means " '[l]iability for which one is personally accountable and for which a wronged party can seek satisfaction out of the wrongdoer's personal assets.' [Citation.] . . . Because the trustee holds title, *but does not* [beneficially] *own* the property in question, there is no issue of personal liability or resort to the trustee's assets. A resulting

16

trust arises by operation of law [citation] and does not implicate the personal liability of the purported trustee." (*Estate of Yool*, at pp. 875-876.)

The *Yool* court found support for its conclusion in the statutes governing creditor claims against a decedent's estate. (Prob. Code, § 9000 et seq.) It noted "Code of Civil Procedure section 366.2 and Probate Code section 9000 are intertwined; each is integral to the procedural framework regulating the timing of actions and the filing of claims by creditors on the personal liability of a decedent." (*Estate of Yool*, *supra*, 151 Cal.App.4th at p. 876.) Probate Code section 9000, subdivision (a) generally defines a " 'claim' " as a "demand for payment," and excludes "a dispute regarding title of a decedent to specific property alleged to be included in the decedent's estate" (*id*., subd. (b).) Accordingly, the court concluded the one-year statute of limitations did not apply.

First, unlike *Yool*, the Ranch's claim against Karl as executor of Roger's will implicates Roger's personal liability and subjects him to a damages claim -- it is not merely a dispute over title, but a claim arising out of an alleged breach of contract. A breach of contract gives rise to a legal claim for damages. (*Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1134 [" '[a]ny breach of contract, whether total or partial, causing measurable injury, gives rise to a claim for damages' "].) The Ranch's strategy has been to circumvent the statute of limitations by voluntarily limiting itself to an equitable remedy. However, the remedy does not determine the nature of the claim. " 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' " (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 682.)

In *Yool*, the issue was simply whether the plaintiff -- who was the beneficial owner of the property -- should also be conveyed title. (*Estate of Yool*, *supra*, 151 Cal.App.4th at pp. 875-876.) Here, by contrast, Roger's breach of contract implicated his personal

liability. This is not a title dispute. It is a claim that Roger breached the terms of a contract. As a result, the Ranch's claim involves the liability of the person.

Second, *Yool* dealt with a claim that did not exist prior to the mother's death. There, the mother never repudiated her duty to convey title during her lifetime. (*Estate of Yool*, *supra*, 151 Cal.App.4th at p. 877.) In that sense, the claim did not "survive" the mother's death because it never existed prior to the mother's death. Here, by contrast, Roger allegedly breached a contract with the Ranch by never executing and recording a transfer of title to the land used by the Ranch in 1982. This conduct gave rise to a cause of action against Roger during his lifetime. (See *Battuello v. Battuello* (1998) 64 Cal.App.4th 842, 846-847 [cause of action for breach of promise to bequeath property accrued prior to testator's death because the testator had made an inter vivos transfer of the property in violation of the agreement and thus Code Civ. Proc., § 366.2 applied].) Accordingly, the Ranch's claim was not only a liability of the person, but it also survived Roger's death. Thus, the Ranch's claim -- however pleaded -- is subject to the one-year statute of limitations of Code of Civil Procedure section 366.2.

## DISPOSITION

The order sustaining the demurrer is affirmed. The judgment after trial is reversed and the trial court is ordered to impose judgment finding Karl is a shareholder of 100 shares of Ranch stock. We remand the matter for the trial court to consider Karl's remaining claims. Defendants shall pay the costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Renner, J.

18